and Bernal. Good morning. Jennifer Daly appearing on behalf of Jose Pineda Castro. Your Honor, this case is one of the criminal cases that involved several defendants. Several issues are raised on appeal. The one issue that I would like to address in the time that I'm allotted. I'm sorry to interrupt, but can you do me a favor? Just pull that microphone a little closer to you. I'm sorry. That's okay. We just want to make sure it gets picked up on the recording. Thank you. I wanted to address the first issue that Mr. Pineda Castro raised on appeal. The issue of the restraints that were on Mr. Castro during most of his testimony. And it's important in considering this particular issue under constitutional concerns that are involved in terms of having a criminal defendant testify in restraints and which erodes the presumption of innocence and it causes the jury to, there's a possibility that the jury could regard him as dangerous or guilty. Now, in this particular case, there's certain things that the court that I don't believe are in dispute. The first thing that's not in dispute is that Mr. Castro was wearing restraints when he testified. The answer brief conceded that leaving Mr. Pineda in restraints while he testified was an inadvertent error. Now, the way that the issue came up, and I'm going to acknowledge just because I need to acknowledge it, that this issue should have been raised in a better way by Mr. Castro's trial counsel. The way that the issue came up is one of the co-defendants counsel first raised the issue. And the issue was raised during a break during cross-examination. And then because of certain interactions that were going on during the trial between Alex Michaels and that issue about those interactions will be addressed by one of the other counsel. The judge basically told the attorney who first raised the issue that you have no standing to raise this issue. This is not your client. Your client is not restrained. But my client's attorney joined into the objection. She indicated to the court that, Your Honor, when Mr. Castro, the record indicates that, at least the attorneys indicated that Mr. Castro was escorted by the marshals to the witness stand in restraints, that the restraints were visible to the jury. There was a comment that was made as well by Mr. Castro's counsel that the jury also heard the noise from the shackles. Did the district court eventually make a finding that the jury could not see the shackles? The district court made that particular finding. But one thing that the court needs to consider is that, and the court also filed a copy of the record that the jury received, that the court room, I mean photographs that were taken of the court room, but one thing that the court needs to consider is first what that finding was based on. I believe we have two attorneys, it's not just one who indicated that the jury had to have seen the shackles. They actually believed the jury had seen the shackles. This case is a little different from a lot of the other cases that were cited because this is a testifying defendant. This is not a case where the issue is whether or not he was shackled by sitting down. This is a case where he was, at least the attorneys indicated, he was escorted to the stand, he testified, he testified in shackles. And another thing too that the court needs to consider is the issue of whether or not the shackles were loud enough for the jury to hear. So are you asking us to conclude that the district court's factual finding was clear error or are you asking us to conclude something different? I am asking you to conclude that based on what the attorney said and based on what I review from the record that I believe the judge erred in stating that the restraints were not visible to the jury, at least based on what the attorney said when Mr. Castro was being escorted to the stand to testify. And I'm going to ask the court to take a look at the, the court also thought that the photographs of the courtroom was basically dispositive to the issue, but I've taken a look at the photographs and it's in the docket entry 162 and looking at the photographs, one of them were quite frankly very hard to see. And in another one, it's unclear from the record, the record at least indicates that if the witness stand was over here, at some point Mr. Castro had to get up and at least based on what the attorney was saying is that he had to be escorted to the stand in order to testify and he apparently did so while the jury was in the courtroom. And we also need to consider as well the comments that were made that Mr. Castro was actually walking in a way that was suggesting that he was bearing the shackles. So it's not just a matter of even if they didn't see the shackles, there was an issue of whether or not it was heard and there was also an issue as to whether or not the sound was loud enough. The judge did what the judge believed was a recreation of what happened so the judge could determine for himself whether or not the jury could have seen it. And then the judge also, at least the record indicates that the judge also took the opportunity to review the recording from the court reporter. In one of the recordings, the judge indicated that he, and I'm going to quote the portion so I don't misstate what's in the record. The judge says, I'm asking the courtroom deputy with my smartphone from the middle seat in the front to record so that we find out whether we can hear the noise. So we are going to hear two things. Number one, what the computer shows as a recording and I certainly heard a little bit of change when it happened but remember I hear everything because I'm a little higher here and now you all would be able to hear it and there will also be a video with the sound. But the record doesn't include, I couldn't find the recording in the record so what we have to rely on here is basically the statements from two attorneys indicating that the defendant was shackled. My concern in terms of this issue is that based on the cases that I've seen, in most of those cases the issue of the shackling is not, the issue is not whether or not the defendant, I'm sorry, in most of those cases the defendant is not testifying and in a lot of those cases we have cases where no objection is made until well after the trial is concluded or after an appeal has been held. And another concern that we have is that this is a case in which the evidence was hotly disputed, there were allegations here of robbery, there were allegations of violence that happened at the robbery so we have an issue where if the jury saw Mr. Pineda Castro wearing restraints whether or not it creates in the jury's mind the feeling that this man is restrained because somebody made a determination that he was actually guilty. And another concern that we have in the record is that the evidence that the government relied upon heavily are meetings that Mr. Castro had with a confidential informant. A lot of the conversations were in Spanish and one of the hotly contested issues whether or not the translations were accurate or whether or not certain words were being added to the transcript to try to suggest that Mr. Castro was the type of person who had engaged in this type of behavior and specifically words such as kidnappers and assassins and I believe that the presence of restraints would suggest to the jury that Mr. Castro was the type of individual who would engage in that behavior. So let me ask you a question about that. I mean I think we all understand, I don't want to speak, I keep doing this, but I should only speak for myself. I fully understand why it would be problematic if your client had been seen in the shackles as he went up to testify. But here we do have two factual findings by the judge. One, that they couldn't be seen by the jury from where the jury was because of the setup of the courtroom and the skirts on the tables as well as the fact that the interpreter was standing between the tables and the witness box. And two, that even though he initially heard a little something that when he listened more closely or whatever that he didn't think it was really discernible as the sound of chains. And so we have to deal with the idea that this is subject to clear, you know, the factual finding must be clearly erroneous. And you've talked about a lot of things, but if you were trying to say that something was clearly erroneous in a nutshell, how would you do it? I would do it based on, I would ask the court to take a look at, there's some evidence that indicates that when Mr. Castro was walking, even if the jury didn't see it, there's some indication in the record that when he was walking, he was walking in a way that the juror could tell that something was restraining his legs from the shackles. I would also look at the fact that we don't just have one person indicating that Mr. Castro saw, that the juror saw Mr. Castro's restraints, we have two. We also have the issue of the chains being heard, the shackles being heard. And I think that based on, and the court itself indicates that there are some serious concerns here. And I think based on that evidence, there is some concern in a case like this where a defendant testifies. I think the concerns are not as great if a defendant doesn't testify. And I basically believe that based on this record, especially because we have more than one person indicating that the shackles were visible, although the judge believed that they were not, that that's an error. Mr. Castro should have been granted a new trial. Thank you, counsel. Thank you, Your Honor. Good morning. May it please the court. I'm Gail Stage and I represent Annabelle Mostillier. I want to start out at the outset by withdrawing my argument in regards to whether or not Judge Moreno varied upward or should have gone through the calculation of an understated criminal history. And the reason that I say that is in preparing for this argument, I reviewed the statement of reasons. And in that, he clearly checks off the box. He writes the word variance and then he states as his reasoning that the criminal history was understated. I wanted to talk about loss amount. In this case, our client's base offense level was raised by two levels, under 2B3.1B7, because the district court found that the loss amount was $95,000 or under $500,000. And the commentary to note three says that the loss of value is the value of the property taken, damaged, or destroyed. Defendants objected to that loss amount, which then shifted the burden to the government at sentencing to establish the loss amount by reliable and specific evidence. At the sentencing, the trial counsel said, your honor, he had witnesses that he wanted to bring to testify in regards to the loss amount to get a more specific amount. But the trial court said, well, what's in the record? What happened at trial? And the government stated, well, one witness said that $17,000 in cash was taken. And the owner of one of the jewelry stores said anywhere from $250,000 to $500,000 in jewelry was taken. Now, this particular owner admitted that he was not responsible for keeping track of the inventory, that he did not keep track of the inventory. He testified unequivocally that on the day of the robbery, the inventory estimate was, quote, not accurate. And he testified that the manager of the store, Milena Martinez, was really the person who was in charge of keeping track of the inventory. Now, Ms. Martinez was there present the day of the robbery. And it was also her responsibility as part of keeping track of the inventory to take pictures. She took her iPad. Every two months or so, she would take pictures of the inventory that was on display. And after the robbery, almost a year later, she gave pictures that she had taken two months prior to the robbery to the government. And she was asked, well, why don't you circle in these pictures what jewelry you believe was actually taken during the robbery? That could be found at government's 38A through H. Those pictures depict 364 items of jewelry. Ms. Martinez circled 11 items of jewelry that she believed was taken. There was absolutely no testimony or evidence regarding the Ariel's Jewelry Store and what amount might have been taken from there. So what we have at best is a specific dollar amount of $17,000, which the manager of Luani's said was taken from one of the safes. And we also have a very broad estimate from the inventory and didn't know what the inventory was the day of the robbery. Ms. Martinez was never asked on the day of the robbery what was the value of the inventory that was taken. The government was required to come forward with some sort of specific evidence. And in this case, the government had jewelry which was found in a closet that it could have gotten some sort of estimate on as to the value of the jewelry. The government could have called witnesses to the sentencing, for instance, from Ariel's Jewelry to testify about the value of the jewelry taken from Ariel's. And the government didn't do that, and partly because the district court kind of discouraged the government from doing that because he said, look, at trial, the owner of the jewelry store said $250. I'll take his word for it. So why do we need to bother with other witnesses? But again, when a defendant challenges facts that are going to increase his sentence, make it more severe, it's up to the government to come forth with some kind of specific and reliable evidence. And in this case, that just didn't happen. It was a guesstimate. And so in our opinion, the district court clearly erred by finding the loss amount to be $95,000 or greater. At best, there's a loss amount of $17,000. There may have been that other jewelry which was evidence, but we have no value. No value was ever placed on that jewelry. So we would like that finding to be reversed and the case remanded to the district court to hold a proper hearing, get specific and reliable evidence if it's available, and to make a proper finding. Thank you, counsel. Thank you. May it please the court, good morning. My name is Thomas Clefani, and I am here on behalf of Yamil Diaz Bernal. For ease of reference, during the course of this argument, I'd like to refer to her as Yamil. And as to Mr. Pineda Castro, simply as Mr. Castro. If your honor, please, it took me a while, quite frankly, to locate a case that had facts similar to this one that dealt with the issue of the antagonistic relationship as it developed during the course of trial between the trial judge and defense counsel. Every one of the cases that have been decided by this court certainly did not have the degree of interference and of colloquy between the trial judge and defense counsel as this case, except we went back to 1973 with United States against Nazaro, which I cited in my brief, which was a case out of the second circuit, which dealt only with that particular adversarial relationship where the trial judge had interfered extraordinarily with the examination of defense witnesses. Not so much here, in this case, but also with respect to caustic comments that were made by the judge in the presence of the jury against defense counsel, some of which was instigated by defense counsel because defense counsel in that case had gone beyond what the district court had ruled in terms of the scope of cross-examination. In this case, however, we have a situation where really it was much more of the district court interfering with or having colloquy with defense counsel, some of which was instigated clearly by comments that were made that shouldn't have been made by defense counsel. The problem was the government neededn't do anything. They needed only to be able to sit down and watch as the trial judge took on the banner of what otherwise opposing counsel would do. The difference with Nazaro and the law in this circuit with Hill is really the same. Really the issue is whether the trial judge so interfered with the evidence as it came in so as to preclude a fair resolution of the facts in the eyes of the jury. Also keeping in mind that when a judge says something in the eyes of those civilians sitting in the jury box, it carries an incredibly much more weight than if lawyers are skirmishing back and forth. What is most important, however, and I've detailed all of the who struck John, so to speak, in my brief. What is most important, I thought, what really tips this case in favor of reversal is when the trial judge unilaterally cut off cross-examination of two critical witnesses from the point of view of Yamil. That was of the lead detective and most importantly the confidential informant who really provided really the only evidence that ended up convicting her of the conspiracy. For example, the trial judge cut off the examination of Sergeant Alvarez when trial counsel was attempting to get information about this fellow, Eddie. Eddie being, in fact, a confidential informant who was not disclosed as such by the government in advance, likely, or as it was explained below, because the government wasn't advised by the police officers that this fellow, Eddie, was, in fact, a highly confidential informant. Of course, I raised that issue in my brief about the disclosure of the confidential informant, which unfortunately trial counsel did not renew his motion at the end of his client's request to renew the disclosure, but be that as it may. Consequently, the trial judge then said, I'm not going to let you cross-examine, I'm paraphrasing, I'm not going to let you cross-examine anymore. You'll tell me at the luncheon recess what your questions are going to be. Needless to say, this poor fellow, at lunch, was a diabetic, he couldn't go to lunch. He had a prostate problem, he couldn't go to lunch. The problem was, the questions or the areas of inquiry that counsel wished to pursue were clearly legitimate areas of cross-examination. The trial judge refused to allow him to go forward. Even worse was with the confidential informant, Hernandez. The trial judge unilaterally cut off counsel in front of the jury saying, you've already gone an hour and 40 minutes, you've done, as far as I'm concerned, you've covered everything you're supposed to cover. Well, excuse me, judge, with all due respect, but this is much more important, this is the major witness in the case, and certainly this circuit and Van Dorn and Phelps have upheld the proposition that counsel should be given as much leeway as possible when it comes to cross-examining key witnesses in the case. And so consequently, and there were also instances where the trial judge jumped in to help the government. One particular instance was when the government was announcing they were not going to play a partial tapes that they had, and at the sidebar, the trial judge said, well, you know, I never like to tell lawyers what to do or how to try their cases. But, and then he proceeds to explain why it would be a good idea for the government to in fact play portions of these tapes, and of course the government, being very astute, decided to change their minds. So likewise, the court did jump in a couple of times to help witnesses who were testifying for the government by saying, with the confidential informant who had prior convictions, and in a cross-examination, counsel was trying to establish that, you know, are you permitted to be around firearms, because the person was a convicted felon, and the judge jumped in and said, no, being around is not the same thing as possessing. Or another instance about juveniles, juvenile is not the same as being young, or something along those lines. The long and short of it is, when contrasted with the other cases that have been decided by this court, clearly this case falls under the rubric of Nazaro. Let me just very briefly talk about peremptory challenges. Back 20 days before, before jury selection, there was a hearing on a motion made by Castro for severance on the grounds of antagonistic defenses. The antagonistic defense was that Yamil was his, well, was still his wife, and she was attempting to point the finger at him, him being her cheating no good husband, is really what it was going to boil down to. So the point is, the trial judge was on notice that there was clearly going to be a difference in terms of what jury would be selected. You know, here we had two, the other two defendants were males, both of whom were actually involved in the three robberies, whereas Yamil is a woman who was not involved, alleged to be involved in any of the three robberies. Can I ask you something? Don't you have to show that there was somebody who was actually impaneled who couldn't be fair, who shouldn't have been on the jury? Right, and there were two of them to qualify. One is the juror Vaughn, V-A-U-G-H-N, whose father was, she said, was a police chief somewhere on El Cachobe, which kind of tells us it was either Miami-Dade or the city of Miami. And there was, the trial judge did not permit any additional questioning, any additional vardar. This was a basic vardar that was conducted only by the court, which I understand passes muster, but in this particular instance there were no additional questions permitted to get into it. And additionally, there was, and of course, needless to say, it was Hialeah police officers who were the two main witnesses for the government in addition to the confidential informant. Additionally, there was the person St. Felix, F-E-L-I-X, who was the dental hygienist who did not wish to be there. She worked at the University of Miami. She had a ton of patients, nobody to cover for her, and once again was not permitted to, was not permitted any additional vardar. And unlike, unlike for example, the Martina Salazar case, which the government cited, where, where a trial counsel there said, objected, wanted a challenge for cause, the challenge was denied, and then exercised a peremptory. Here, the, there was no other, there was no choice, there were no more peremptories to exercise anyway, and so both these jurors receded. And so that makes the difference. And finally, before I see the red light is going on, I don't want to overlook the fact that while I think certainly the, the two issues that I, well certainly the first issue I have discussed with you, certainly on its own merits, merits a reversal into the cumulative error document, doctrine. We have a situation where we have the unprecedented antagonism on the record in front of the jury between trial counsel and the trial judge. You have the circumscribed, circumcised cross-examinations of critical witnesses. You have this jury selection procedure, which maybe on its face does not seem to raise a red flag, but in the context of this case certainly was unhelpful and contributed to the demise of, of Yamil. And then we have the, the, the business about cutting off the production of the confidential informant, Eddie, which whether trial counsel, you know, wasn't astute enough below to, to preserve it the way he should or not, nevertheless still raised the issue. Taken together for sure requires reversal. I thought they knew who Eddie was. I'm sorry, Your Honor. I thought they knew who Eddie was. The court says I don't need to reveal it because you all already know who Eddie is. Well, she knew who Eddie was because Eddie was at the meeting, but how to locate Eddie was the other problem and to produce him was the problem, Your Honor. Let me ask you about the juror with the, dad with the police officer. My notes say the police officer father had died. He was no longer living and he'd both worked as a police officer but also in human resources too. Yes, Your Honor. Okay, I'm just trying to make sure it wasn't like her father was still alive as a police officer. He had died. Oh, no, I understand that, but she was, but she was obviously raised within that, within that genre and in that culture, Your Honor. Okay, but she said if knowing a police officer was going to make a field toward one side or the other, she said no. I mean, sometimes people will say yes to that question. I know and sometimes if given the opportunity to have just a little bit more of a voir dire, they tend to change their minds. Yeah. Okay. Thank you, Your Honor. Good morning. May it please the court, Jason Wu on behalf of the United States. With me at council table is Maisha Darrow, one of the AUSAs who tried this case. An old bit of show business wisdom teaches that if opportunity doesn't knock, build a And judging by the distinctive modus operandi used by the appellants in this case, they lived by that credo. They were convicted at trial after a jury heard extensive evidence of their crimes, including recorded conversations during which Mr. Panetta described this modus operandi and gave very specific factual details about the prior offenses. Nothing they've raised today or in their briefs justifies reversing their convictions or their sentences with the one which we conceded in our submission. Unless the court directs me elsewhere, I'll start with the shackling issue raised by Mr. Panetta Castro today. And I want to be clear right off the bat. It was a mistake. It should not have happened. However, it was harmless for two complementary reasons. The first being that as the trial court found and as Mr. Panetta Castro now has to demonstrate his clear error, the jury did not see or hear these restraints. And the second interrelated reason is that the strength of the evidence against Mr. Panetta Castro was actually the most powerful among the three defendants. So let me start with that first point, the perception of the jury. As Judge Rosenbaum and Judge Grant have alluded to, the district court conducted what essentially amounted to an evidentiary hearing on this issue. And it found and stated its conclusion that the jury had not seen or heard these restraints. And I think today they've brought up arguments that are more akin to the arguments they could have or should have did in some cases raise during the evidentiary hearing, which is that they believed the jury had seen those. But those were not assertions that the district court adopted or accepted and incorporated into its findings. I think that makes this case very analogous to the Chung decision, which I cited in our briefs, which is a case where there was a very narrow theoretical window of visibility. The defendant walked into the courtroom in shackles and then took his table. And the court there noted that it was possible for the jury to have seen him because in the instant that the doors of the courtroom opened, if the members of the jury panel had noticed him, they might have seen him in shackles. But this court concluded that it was harmless because of the unlikelihood that the jurors had noticed anything. Here, I think we have a better record because the district court conducted this evidentiary hearing and made it. What I don't understand about this case is you've got three lawyers for defense counsel. I assume you've got at least two government prosecutors at the table, right? Correct. Everybody knows these defendants are shackled, apparently. Did the prosecutor not know they were shackled? So there's certainly no record indication the prosecutors knew. And I would point out the physical layout. How do you not know when they're brought in by the marshals whether they're shackled or not? Again, there's nothing in the record to indicate that. But I will say the layout of the courtroom is such that just as the defendant's feet are obscured from the jury, they're actually obscured from the prosecutor's as well. We sit at the opposite table. So there's no guarantee that you can see that you're caught. All right. So would defense counsel be able to know their clients? Maybe I should ask that. Would defense counsel be able to know their clients are shackled if they're sitting next to them? Yes, Your Honor. And in fact, I believe the record demonstrates. And as counsel for Mr. Panetticastro. I just don't understand how you're having a trial and all these lawyers and nobody says before the witness walks up there, we need to get him unshackled or whatever the situation is. Absolutely. It's hard for me to imagine why with all those lawyers in the courtroom, somebody doesn't say that. I appreciate and understand the concern, Judge Hall. Help me why that doesn't happen. And that is on the record that Mr. Panetticastro's counsel, I believe at docket entry 272, page 69, had a dialogue with the court about this. And that was after he had already testified, right? Correct. But she alluded to the fact that I think she said, because Your Honor, the jury was present and I didn't want to make a bigger ado about it at that time, which I think she's alluding to at the time when he's walking up, which indicates that she was aware her client was shackled. And I believe the dialogue goes on where she suggests that she felt that Judge Moreno was unwilling to grant sidebars and therefore she didn't want to ask him for one. But I think in that situation, it's incumbent upon defense counsel at the point in which they've realized that to demand that sidebar and at least put themselves on the record that they're trying very hard to prevent what turns out to be an inadvertent error. Let me also point out, I'll make a few observations. The first is that the court stated on the record that it took about 26 seconds for the defendant to come around from his seated position to the witness stand. So I just want us to all understand that we're discussing essentially a 30-second episode in a week-long trial, which I think affects the harmlessness analysis. And that there were two defense decisions, I think, that confirmed that there was no prejudice to them. The first is that they rejected the offer of a curative instruction. That's at docket entry 272, page 77. And moreover, later when the judge was conducting this evidentiary hearing, he offhandedly suggested that he would be willing to ask the jurors to have a direct inquiry to see how much they had seen or heard. And defense counsel did not take him up on that offer. The second point I want to make there is that the larger point as to harmlessness. How would that work? I mean, that seems like if the judge calls in the jurors and says, did you see this defendant in shackles, right? I mean, doesn't that create the very problem that we're trying to correct? So I think the inquiry could potentially be conducted with more subtlety. That's what I'm asking. What would the inquiry be that would uncover that? Did you see anything strange? I mean, what would it be? I'll add before you answer that judging from the transcript and some of the contentions of counsel, it hasn't been seen that the judge was always handling everything as smoothly as possible. Understood, Judge Grant. That being said, I think the question could have been asked, did you notice anything unusual about the defendant? Did you perceive anything different about him versus his co-defendants? Did you notice his feet, for instance? That would certainly be a strange question for a juror to hear if they hadn't noticed the shackles, but it also would not- There's no way you could inquire without making this situation worse. I think that's just ipso facto. So I want to know, when was it first raised? After the witness sat down, when did this all occur? The first objection, and I know it wasn't even by his counsel. It was by another person's counsel. Correct. It was raised during a break in the government's cross-examination. By that point, Mr. Panetta-Castro testified on direct, directed by his own counsel, and then I believe there had been cross-completed by the- He was called as part of the defense. He testified himself, his counsel direct, and then it was on cross. Yes, and to be clear, in fact, the other defendants had already had their chance to cross-examine him, I believe, and it was the government's cross-examination, which was almost the third or fourth lawyer to get up there and ask him questions. It was a break during the government's cross-examination when Diaz-Bernal's counsel chose to raise this issue. So moving on to that second point, I will note, once you have that inquiry, I think the way to cure it is to do a curative instruction. So the court could have given a robust curative instruction in this case. Not only would the court have said, do not consider that fact, the court would have even informed the jury that it was a mistake that he came in shackles. So I don't see how the jury could have, at that point, drawn any adverse inference when they realized it was a mistake of the court or the marshals. But on that second point, I wanted to stress that the evidence against Mr. Pineda-Castro was very strong in this case. It consisted of his own admissions and a series of recorded conversations during which he, as I said earlier, described the group's modus operandi and gave very specific incriminating details that only these robbers would have known, like his exact attire during one of the robberies, a Batman shirt. The fact that there were 36 Rolex watches in the window at Real Deal Jewelry, which was the last attempted failed robbery. And the owner of that jewelry store testified at trial that, indeed, there were exactly 36 Rolex watches in his window on the morning when they attempted to rob him. So I think given the strength of that evidence and the unlikelihood that the jurors saw or heard these restraints, this court should find that error harmless. Let me turn next briefly to the issue of jury selection. And Judge Rosenbaum, you got it exactly right. The standard is that they have to show a juror was seated who could not be impartial in this case. And they've attempted to do that by identifying two jurors, one of whom has a relative, her father, who is a former police officer. And again, that's not the standard for a cause challenge. If that was the standard for a cause challenge, literally no relative of a law enforcement officer or a prosecutor could ever sit on the jury because the dialogue with her was entirely innocuous. She admitted or described this family relationship to the judge. And then when he asked her directly whether she would feel toward one side or another, in other words, favor either side, she said no. And as the supplemental authority that I submitted indicates, while we don't take that as entirely dispositive, it's certainly indicative of the fact that she could be a fair juror. Would you agree that it is kind of problematic that the court did not allow counsel for the three defendants to confer in private? I mean, there might be strategic considerations and things of that nature. That does seem troubling to me. Obviously, if they can't show prejudice in the end, it doesn't have an effect on the outcome of the trial. But that seems troubling to me. I wonder if you could address that. Of course, Judge Rosenbaum. Well, as the Supreme Court and this court have noted, there's really no prescribed way of conducting jury selection. It's why the district courts and district judges around this country vary widely in their practices. That's true. Let me ask you to address this part of it. Even though there's no prescribed way to conduct jury selection, we do have rules about invading the defense camp and things of that nature. And it seems to me that requiring defense counsel to confer about their strategy in who to strike and who to leave on the jury, and to do that in front of the government and the court, sort of tends to invade the defense camp a bit. Your Honor, I disagree with that insofar as I believe it's very possible, especially given the size of the courtrooms here in Miami, that when the defense counsel are conferring at their own table or on their side of the courtroom, it is not audible or perceptible to the prosecutors. I've never heard of any allegation of invasion of defense camp, just solely based around the fact that a defendant and his counsel or two defense counsel had to have a conversation inside the courtroom. And there's no indication in the transcript, for instance, that they were audible, because I think the transcript, in fact, would have picked up. And it says at one point, I noted, that it reflected a brief discussion among counsel off the record. I remember that was at page 108 of that transcript, documentary 267. So I think the situation that's being depicted there is that the defense counsel are off on one side of the room, quietly conferring so that no one can hear them, no privilege invasion issues, and then they come to determinations as to which jurors to strike. And they might not have agreed entirely, but nonetheless, they received exactly what the rule entitled them to. If there are no further questions on that issue, I will move on to the relationship, such as it was, between the trial judge and defense counsel for Ms. Diaz. And there are three reasons why this does not constitute reversible error. The first is that it was prompted, in large part, by the actions of defense counsel himself. Ms. Diaz Bernal's counsel was extremely argumentative, not only with the court, but with the witnesses themselves. And I think at one point in the transcript, a particularly memorable point, he refers to himself as a street fighter. That's at documentary 267, page 375. And he conducted trial that way, constantly fighting with the witnesses and with the judge himself. And that includes comments such as interjecting at one point during the court's ruling on the shackling issue. He interjected, Jesus Christ. That's at documentary 272, page 69. And so I think we have to take into context that when the trial judge is trying to manage and expedite this case, it makes sense that when he has a strong-willed defense counsel, he has to present a little more strength as well. And just as a few more examples of the argumentative nature of these cross-examinations that prompted many of the district court comments, I would ask the court to look closely at Mr. Michael's cross-examination of the witness, the confidential informant. So as an example, at documentary 271, page 38, he asks, really? You have no idea who my client is? And the witness answers, I see you talking to everybody there. I'm not sure who your client is. The question, such as it is, that follows is, all of a sudden, you're very lost, young and innocent. At page 43, he asks, you like setting innocent people up for money? Response, sir, they're not innocent. Question, again, such as it is, you like setting people up for money, ma'am? Answer, no, sir. Question, yes, you do. I think that continues. I can give more examples. I'll give one more, which is at page 49. The witness continues to answer this line of argumentative cross-examination by saying, I don't set anybody up. Mr. Michaels replies, yes, you do, ma'am. She says, no. He reiterates, yes, you do. So that's hopefully to give you a flavor. The one I like was when he asked the CI, are you still a CI? And working as a CI, and the CI says, no. And he says, thank God. That's right. Well, so, yes. That's one of the better ones. That's certainly a very good one, Judge Hall. That occurs, I believe, with the cross-examination perspective. I like the one where he says, nice tat. Yes, he says that as well. He says, are those your hands, officer? And the officer says, Judge, what does it matter if those are my fingers on the photograph? The judge says, answer the question. And he says, yes, those are my hands, the officer does. And the lawyer says, nice tats, officer. That's exactly right. He says that as well. It just goes on and on. It goes on and on at another point. It really does. He criticizes a law enforcement witness, or I believe maybe it was the confidential informant, and says, you seem to be trained in what to answer. Not much of a question there. That's at docket entry 270, page 174. That one's mild. That one's probably OK. In context, that's probably right. And the second point I wanted to make here goes to the idea that the district court did not demonstrate any bias or prejudice in favor of the government because we got the same treatment. And I'll give you a few examples of that as well at docket entry 267, page 385 to 86. He was unimpressed with a series of questions we asked, which related to a photograph. And he said, skip the 1,000 words and ask your questions while they're looking at the picture. At another point, while examining one of these victims, docket entry 268, page 139, he interjected and cut off trial counsel for the government and stated, does that matter? What am I missing? So in terms of the idea that the court made comments that were disparaging of the defense case, he certainly made a fair amount of comments that were disparaging of the presentation of the government case as well. And so he was even-handed, which is one of the critical factors that this court identified in Hill. And finally, I think the most vivid one is the district court at docket entry 271, page 156, suggested to the government during a redirect examination, give up asking it all together. See, I'm an equal opportunity strict guy. I think the district court spoke the truth. Do you address the case count of Eliza Nazario? Are you familiar with it? I have to admit, I looked at it a long time ago. I'm not sure as to the exact factual circumstances of that case. What I will say is all these cases ultimately stand on their own. Of course, they deal with long trials in individuated interactions between a district judge and counsel. So we're never going to find a perfect analogy for this case or any other. I will note that this court itself has affirmed this particular trial judge's way of conducting trial before, including in the Fuentes decision, which includes very similar complaints about sustaining his own objections to questions, cutting off examinations, or at least interposing his own questions or corrections to examinations. I think the separate claim or subclaim that's raised by Ms. Diaz-Bernal is that she was curtailed in her cross-examination of two witnesses. And I would like to address that. There were three points that she put on the record that she wanted to delve into with these witnesses that she claims that she was denied an opportunity. And that was harmless because she was able to present that through other witnesses, or indeed, she took the stand herself and testified to these points, as did her husband, Mr. Panetta-Castro. The first topic of cross-examination was that Eddie had provided drugs to Panetta-Castro, including methamphetamines. That was confirmed by Hernandez later in the trial and during her cross-examination at docket entry 271, pages 21 to 22, and 140. And then Panetta-Castro himself took the stand. And he said, I was on drugs. They were provided by Eddie. The second point that Ms. Diaz-Bernal identified is that she wanted to explore how Panetta-Castro and Eddie met or knew each other. Again, something that she was able and the other counsel were able to cross-examine Hernandez who explained that she thought they were friends and acquaintances who had met through a mutual friend. And then Panetta-Castro took the stand and testified that Eddie was his drug dealer. That was at docket entry 272, 40 to 41. And finally, the larger topic or more abstract topic, I should say, was disputing the translations and the exact statements that Diaz-Bernal had made in those recorded conversations. Not only was she able to do that while cross-examining Hernandez, she then took the stand and attempted to give an account for why she had made those statements and dispute in some discrete instances the meaning of what she had said or certain what she claimed were omissions in the transcript. And so because of that, they were able to present every argument to the jury that they wanted to present. And in other words, the curtailment of the cross-examination did not affect the presentation of their case. Finally, let me turn to Mr. Mustalier's argument regarding the loss amount. And I think we don't dispute what the record holds in that. We just dispute what import the court was allowed to draw from that. Essentially, the trial witnesses testified that there was $17,000 in the safe at Luwani Jewelers and the owner of the business testified that that store location held between $250 and $500. of merchandise. He also testified that at the time of the robberies, they did not keep daily inventories, item by item inventories. And so therefore, he did not have what he called accurate records of exactly what was in the business. However, the reason that the district court could rely on that is that he only needs to come up with a reasonable estimate of the loss. And it seems fair to us that the business owner, the person who runs this business, knows its books, is going to be the person in the best position to give as reliable an estimate as you can achieve of how much merchandise and inventory is held in that store. And so, especially when you give it the fact that he gave a pretty generous range, an estimate of $250 to $500, and the district court only needed to take the lower end of that, aggregate it with the amount of cash that was stolen, and that would get him far above the $95,000 threshold for meeting this particular enhancement. I will also, I want to respond to counsel's assertion that there could have been an item by item appraisal or evaluation of the loss amount, and she pointed to Government's Exhibit 38A and H, and I wanted to explain what that was. So, Government's Exhibit 38A through H show one of the Luwani employee's attempts to identify pieces of jewelry that were found later in Mr. Mustelier's residence, and specifically in his girlfriend's bedroom closet. And so, that does not represent all the pieces that were stolen from Luwani. That only represents her ability to match up pieces that used to be in their inventory with items found in Mr. Mustelier's home. Of course, by the time they found those pieces of jewelry, more than a year had elapsed since the Luwani robbery, which was a May 2015 robbery. Jewelry recovered in August 2016. So, that's not everything that was stolen from Luwani. It stands to reason that with a year and three months or so, year and a half of time, Mr. Mustelier and his crew would have been able to sell or dispose of many of those pieces. And so, it's not really fair at that point to say that the loss amount should be restricted to what jewelry was remaining at his home. We're more concerned with the jewelry that was taken from the store itself. If this court has no further questions regarding any of these topics, I think the bottom line of this case is that, as the Supreme Court often likes to say, defendants are entitled to a fair trial, but not a perfect trial, because there are no perfect trials. And the appellants did not receive the first perfect trial in this nation's 230-odd year history, but they did receive a fair one. And because of that, we respectfully ask that this court affirm their convictions and their sentences, with the exception of that 922G sentence. Thank you very much. Thank you, counsel. Thank you. I was concerned I did not have time. In my one minute, I want to agree with the questions from, at least the suggestion from the panel and the questions about whether or not a curative instruction could have cured what I saw as the problems with the restraints. I don't believe a curative instruction could have. Once the juror is instructed or asked some questions that the government suggested about whether or not you observed anything with Mr. Castro's leg or the way he was walking, I think in their mind is going to raise the question again as to whether or not they actually saw something and what the effect of it is. The second thing that I wanted to raise is the issue of the U.S. versus Chong case. And I asked the court to take a look at that case. In that case, the issue of the restraints arose in a different context. That was in the jury selection proceeding. And the case indicates that the indication in the record was that some potential jurors may have seen the defendant in shackles in contrast to this case where there was some indication that Mr. Castro was seen in shackles moving from the defense table to the witness stand. And also in that case, in the Chong case, the U.S. marshal also provided some information concerning his vantage point and where he was able to observe whether or not the potential jurors could or could not have observed. And there was no indication in at least the Chong case that there was also the issue of whether or not the shackles were heard by the juror. And I think in this case, the error could not be harmless. There are constitutional concerns involved. And I disagree with the government that a fair trial was given to my clients. And I think that based on the issues I raised in the brief and also I join in on the cumulative error issue, and we request that his sentence be reversed and he be given an opportunity for a new trial without restraint. Thank you. Thank you, Your Honor. First of all, I want to make it clear that I'm not suggesting that the only jewelry that was taken was the 11 items that were circled by Ms. Martinez. That's not my point. My point is that those pictures were two months old. And within the two months, that's the sort of turnover that rapidly happens at this pawn shop. And the person that should have been called to testify at sentencing is the person with the best knowledge. And while it's all good and well to say that the owner should have known, the owner specifically said he did not know. It was not his responsibility to keep track of inventory. And that whatever tracking they had at the time of the robbery was absolutely not accurate. They could have called Ms. Martinez. They could have called someone from Ariel's. They did have records of the value of the items that were pawned. They could have, in fact, those were provided to the government. The government could have brought those records to sentencing. This case is distinguishable from the cases cited by the government because in those cases, the person who testified at trial had direct knowledge of the finances in Hedge's opinion, as an example. So he knew over time how much they were paying on trucking. I mean, he had very specific knowledge. He did say around $20,000, but he based that on his own personal knowledge of what the loss was. And in this case, it was the government's burden. The government failed to meet its burden. And we ask that this court reverse and remand. I join in on the cumulative argument, error argument, as well. And we rely on our briefs for the remaining arguments. Thank you. Thank you. In response to the question, Judge Rosenbaum, that you had asked in your concern about the preemptory challenges, may I direct your attention to 267 and 107 and 108. That was the critical time when counsel were actually having to exercise their challenges. And that's when defense counsel wanted to be able to consult in private. The judge said, no secret consulting. You can consult here. And then finally saying, you don't have to consult. With respect to the Fuentes case on the other issue that I raised, Fuentes was affirmed by this court because the trial judge was an equal opportunity interrupter. He interrupted everybody's case pretty much the same way. And consequently, there was no error, unlike here, which is clearly something different. And finally, with respect to that trial counsel invited, he asked for what he got. This wasn't a street fight. This wasn't a debate. This was a trial where a federal judge was involved. What would have happened if, for example, as it should, where the government would have lodged an objection to a comment that was made by counsel, the objection was sustained, and counsel was told that you're not to do that. And what if the government would have said, thank God, or made one of the other comments that the district judge made to that lawyer? I dare say that the district judge would have reprimanded the prosecutor for having made that comment. Coming from the trial judge was devastating. That is why this case needs to be reversed. Thank you, Your Honors. Thank you, counsel. We're going to take a short break, and we will reconvene at 10.05.